**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**BRYSON CITY DIVISION**
**CIVIL CASE NO. 2:09cv043**

| | | |
|---|---|---|
| **GRADY ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

_____

**THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 13] and the Defendant's Motion for Summary

Judgment [Doc. 14].


**I.     PROCEDURAL HISTORY**

Plaintiff filed an application for a period of disability and Disability

Insurance Benefits on July 29, 2003, alleging disability with an onset of

May 24, 2002, which was later amended to March 2, 2004.  [Transcript

("T.") 115, 34].[1]  Plaintiff's claims were denied initially and on

_____

[1]This proceeding followed a prior application by the Plaintiff, filed on June 17, 2002
alleging a date of onset of April 1, 2002, which was shortly thereafter amended to May
24, 2002.  [T. 119, 138, 16, 34].

reconsideration. [T. 89-92, 84-6]. A hearing was held in Tampa, Florida[2] before Administrative Law Judge (hereinafter, "ALJ") Francis H. Ayer on September 6, 2007. [T. 27-62]. On October 15, 2007, the ALJ issued a decision denying the Plaintiff benefits. [T. 16-25]. The Appeals Council entered additional evidence into the record, but denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 6-9]. The Plaintiff has exhausted all administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

---

[2]Plaintiff now resides in North Carolina, so this case is properly brought in this district.

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. § 405(g).  The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below.  Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.  THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.  20 C.F.R. §§404.1520, 416.920.  If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied.  Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the

application is denied regardless of the medical condition, age, education, or work experience of the applicant.  20 C.F.R. §§404.1520, 416.920. Second, the applicant must show a severe impairment.  If the applicant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the applicant is not disabled.  Id.  Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the applicant is disabled regardless of age, education or work experience.  Id.  Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past.  If the claimant can still perform that work, then a finding of not disabled is mandated.  Id.  Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work.  If so, then the claimant is not disabled.  Id.

## IV.    FACTS AS STATED IN THE RECORD

Evidence of record may fairly be summarized as follows:

Plaintiff worked for many years as a glazier, a primarily outdoor job handling glass.  He developed porphyria, a photosensitivity related disease that creates problems for the skin and significant limitations on the functioning of his hands and other affected areas.  Working indoors alleviates most symptoms and limitations.  He also developed hepatitis C, with some limitations therefrom.  Conflicting evidence suggests mental impairments with limitations of problems with concentrating, following complex directions, stress and change.

Pertinent specific evidence is as follows:

The Plaintiff was 44 years old at the time of the ALJ's hearing, and completed the ninth grade.  [T. 119, 30].  Evidence from the development stage of the claim is as follows.  In his undated Function Report, SSA 3378 BK, Plaintiff indicated that sunlight aggravates his hands, preventing him from lifting heavy sheets of glass, operating drills or saws, doing dishes, vaccuuming, or following previous hobbies. [T. 141, 143-4].  An SSA interviewer was unable to complete an interview of Plaintiff on June 7, 2002, noting his problems remembering and understanding the forms. [T. 147].  The Plaintiff stated that his disabling conditions include hepatitis C,

severe depression, and occasional anxiety attacks, and pain from ulcers on his hands as well as abdominal pain. [T. 150]. He indicated that he has been a glazier for 17 years. [T. 151]. It requires lifting heavy panes of glass and using power tools and glass cutters, all while outdoors where the sun exacerbates his hand pain. [T. 150].

His brother noted on the form that Plaintiff's open sores on his hands prevent him from cooking or cleaning at all. He only makes his own coffee. His activities are watching TV, reading the newspaper, showering and bandaging his hands. [T. 159, 161]. His skin hurts in the sun and heat; he only goes outside in the early mornings or in the evening and avoids the sun. [T. 162]. He is a very different person from who he was previously. He does not want to talk about his illness, and is disagreeable. [T. 163]. He is ashamed of his appearance and so does not socialize. His grip is weak. He gets tired even from such simple things as a trip to Walmart. He loses interest after a short time. He cannot follow complicated directions. [T. 164]. He cannot handle stress or any significant change to routine. [T. 165]. Plaintiff testified that he used to golf and fish, but cannot do so now. [T. 169]. He cannot concentrate on more than one thing; he has trouble filtering out excess information. [T. 170]. In written interviews, Plaintiff described the pain in his hands and arms as a hot burning sensation that is

severe, like they are on fire.  He has to take cold showers to alleviate the

pain.  Ice packs help a little. [T. 197].  He uses Aleve, but it is not very

effective anymore.  He has not required other therapies for his hands.

Aching in his hands affects his sleep. [T. 198].  The heat and constant

vibration from power tools, as well as his weak grip, prevent his use of

power tools.  Writing similarly caused him pain.   [T. 200].  In a later

statement, Plaintiff's brother said that Plaintiff has no energy or motivation

and has lost all interest; and that he is embarrassed by his disease and

does not want to be seen.   He gets along with people, but does not talk.

[T. 239].   Deadlines only frustrate him, and he cannot maintain pace or

remember task instructions.  Merely touching or bumping things causes his

skin to break open. [T. 240].

Medical evidence of record is as follows:

Plaintiff was seen by Stephen M. Chiarello, MD from October 7, 1996

through March 10, 1997. [T. 246-253].   Dr. Chiarello diagnosed Plaintiff's

porphyria.[3]  That day and throughout the treating relationship, Dr. Chiarello

---

[3]Porphyria is a disturbance of porphyrin metabolism, characterized biochemically by
marked increase in formation and excretion of porphyrins or their precursors and
clinically by various neurologic and cutaneous manifestations.  Porphyria cutanea tarda
(PCT) is the most common form of porphyria, characterized by cutaneous
photosensitivity that causes scarring bullae, and hyperpigmentation.  It is frequently
associated with alcohol abuse, liver disease, or hepatic siderosis.  Urinary levels of
uroporphyrin and coproporphyrin are increased and activity of uroporphyrinogen
decarboxylase is decreased.  Dorland's Illustrated Medical Dictionary, 1519 (31st Ed.,

strictly warned against drinking and sunlight, noting that Plaintiff drank 5-6 beers daily, more on weekends. Skin ointments and sunscreen were provided. [T. 246]. Abscessed pustules arose, requiring drainage. [T. 247, 248, 249, 254]. A staph infection developed in his left hand from this. [T. 248]. On November 12, 1996, "extreme solar damage" was noted. He did not complain of pain, [T. 255], and tested positive for hepatitis C. [T. 251]. By January 7, 1997, his porphyria was somewhat improved with the chloroquine phosphate medication. He was ordered to avoid pesticides. [T. 252]. By March 10, 1997, notes indicated that full interferon for hepatitis C was discussed as a treatment mode once his disease became symptomatic. He was ordered to avoid additional iron in his diet, never drink alcohol, and to avoid toxins (waste chemicals, Tylenol) and the sun. [T. 253].

On February 19, 1997, Plaintiff initiated treatment with Douglas A. Kuperman, M.D. for evaluation of abnormal liver tests. Plaintiff had a six pack per day drinking history but no drinking in the prior four months. His

---

Saunders Elsevier 2007). Put more simply, phorphyria cutanea tarda (PCT) is characterized by blistering of the skin in areas that receive higher levels of exposure to sunlight. It results from low levels of the enzyme responsible for the fifth step in heme production. Heme is a vital molecule for all of the body's organs. It is a component of hemoglobin, the molecule that carries oxygen in the blood. Wikipedia, the free encyclopedia, Porphyria cutanea tarda, http://en.wikipedia.org/wiki/Porphyria_cutanea_tarda (last visited October 4, 2010).

hands showed bullous lesions and excoriations, but no rash. Phlebotomy was highly recommended to treat the porphyria (also referred to as porphyria cutanea tarda or PCT), which would require discontinuation of Chloroquine. [T. 292-4]. Plaintiff returned to Dr. Kuperman on April 17, having had phlebotomy therepy, and complaining of occasional arthralgias and blistering. Tests showed a positive hepatitis C antibody. [T. 291]. By June 2, he no longer had arthralgias, but continued to have intermittent blistering on his hands and fingers, and continued significant sun exposure. A liver biopsy followed by Intron-A therapy for chronic hepatitis was discussed and recommended. [T. 289]. By July 21, Plaintiff's skin changes resulting from porphyria had been significantly reduced by avoidance of sun and alcohol, and phlebotomy. His liver biopsy results were interpreted as chronic hepatitis, mild periportal inflammation, and minimal periportal fibrosis but no cirrhosis. Hepatitis C antibody titers were positive. The recommendation of twelve to eighteen months of Intron-A therapy was repeated, but Plaintiff stated he would only take it if it was approved by his insurance carrier. [T. 288]. On August 25, records indicate Plaintiff had stopped phlebotomy and initiated Intron-A therapy. This caused him significant fatigue, aches and pain. He experienced no nausea or itching. [T. 287]. On September 30, side effects had caused Plaintiff to drop below

therapeutic levels of Intron-A, and other therapy combinations were under consideration. [T. 286]. On June 9, 1997 Plaintiff was sent for a CT-directed liver biopsy, for the purpose of ruling out chronic active hepatitis. [T. 263, 265]. The surgical pathology report showed an infiltrate of mononuclear inflammatory cells with minimal extension into the lobules, with no hepatocellular necrosis, and no features of regeneration or steatosis. [T. 272, 296].

Plaintiff initiated treatment with James Amontree, M.D. at the Center for Digestive and Liver Disorders on December 12, 2000 for chronic hepatitis C. It was noted that he had difficulty recounting his medical history. He admitted that he had one nonprofessional tattoo out of several applied 10 years ago, and used cocaine. He reported some weight loss, fair energy, and no pain. He was very vague about the details of his current alcohol habit. He reported depression and occasional suicidal thoughts. Hepatitis C virus, antibody positive, was revealed during a recent hepatitis profile. [T. 318]. A progress note dated January 10, 2001 indicated Plaintiff had not followed recommendations regarding medication, getting vaccinated, or seeing a psychiatrist so that treatment for his hepatitis C could resume. His prothrombin time was normal, and he had no edema or clubbing. Blisters were healing. [T. 316].

Charlotte County Health Department records from April 24 to May 17, 2002 reflect that Plaintiff displayed multiple open sores on both hands, elbows, and the backs of his ears. He indicated he drank "beer after work" but used no street drugs. [T. 331-2].

On October 10, 2002, the Plaintiff was evaluated by Dr. Robert Ikeman of the Sarasota Arthritis Center for the Office of Disability Determinations. [T. 403-6]. He noted Plaintiff's primary problem as a progressive photosensitive painful rash primarily on his hands. The pain was usually worse at night, and had bothered him more in the past year. It had gotten better since he stopped being out in the sun, which his job required. He only drank the occasional beer. His interferon treatments ended with his health insurance. No problem bothered him other than occasional headaches. He could handle his own activities of daily living. Physical exam showed multiple lesions on his hands, forearms, ear and neck. All ranges of motion were normal. Dr. Ikeman concluded that his PCT may well give him significant pain, and that it, rather than any underlying arthritis, was the origin of his pain. Hepatitis C was the likely origin of his fatigue. It was recommended that he avoid drinking, smoking, prolonged sun exposure, and outdoor work. His subjective complaints were consistent with the physical findings.

On October 11, 2002, Plaintiff was evaluated by Jan S. Harmon, Psy.D. for Disability Determination Services (DDS). [T. 335-7].  Plaintiff told Dr. Harmon that blisters, pain and burning of his hands interfere with work, sleep, and being outside in the heat.  His appearance was unkempt, and he was guarded and vague in his responses and reports of symptoms.  He believed he contracted hepatitis C from a tattoo.  He preferred solitary activity.  He told Dr. Harmon that he was not seeing any physician or taking any medications currently, and had not had a physical exam in five years.  He was alert and fully oriented, but had limited insight and was suspected of malingering due to his vagueness and hostility.    Dr. Harmon provided no Axis I diagnosis, and an Axis II diagnosis of personality disorder.  He had a GAF score[4] of 60. [T. 337].

On October 30, 2002, Dr. Nectar Aintablian performed a physical Residual Functional Capacity (RFC) assessment on Plaintiff. [T. 338-345]. It assessed Plaintiff as capable of light work with avoidance of sun

_____

[4]GAF (Global Assessment of Functioning) scores are a means of indicating a clinician's judgment of an individual's overall level of functioning, which is required at Axis 5 of a psychological evaluation.  GAF scores rate psychological, social and occupational functioning, but not impairments from physical or environmental limitations.  A GAF score represents whichever is worst at the moment between symptom severity and level of functioning.  Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR 32-33  (American Psychiatric Association, 2000). GAF scores measure "current period functioning," meaning they are a snapshot of conditions at a particular moment, not of how a person will feel or function over a period of time.  Id.

exposure.  [T. 343].

On November 15, 2002, Sharon Ames-Dennard, PhD. performed a Psychiatric Review Technique (PRT) for DDS. [T. 346-359].  She found no severe impairments upon evaluating Plaintiff's personality disorder. [T. 346].

On January 30, 2003, Plaintiff underwent a psychosocial evaluation by Doris K. Bohan, Ed.D at the Mental Health Center of Englewood.    [T. 417-9].  She noted that he was very vague and seemed not to know a lot of his history.  The only mental health treatment he could recall was once being put on Paxil.  He has no trouble relating to other people.  He dropped out of school in the tenth grade, but not due to difficulties in school or a need to work.  Dr. Bohan stated, "[i]t is clear that this man is depressed just based on the circumstances of his current life."  [T. 418].  She diagnosed him with major depressive disorder.

On October 14, 2003, another PRT was performed for DDS by Michael R. Stevens, Ph.D.  [T. 360-374].  He found insufficient evidence of impairments. [T. 360]. On October 12, 2004, Plaintiff underwent a psychological evaluation by Kenneth A. Visser, Ph.D. [T. 375- 8].  He drove himself to the appointment, yet said driving during the day makes his hands burn.  His back bowed backward when he walked.  He stated that his chief

complaint was pain and weakness in his hands which he said had started "a couple of years ago." Reading is his only hobby. He cannot do laundry or scrub the floor because it hurts his hands and back. He stated that he saw a psychiatrist several years ago and received anti-depressants. He did not express a range of feeling, and indicated he is depressed most days. He has a diminished ability to think or concentrate. Doing mathematical problems in his head evoked his problems with focus, making him tearful. [T. 377]. His intellectual functioning was average. Dr. Visser indicated that depression may be limiting some of his activity. He diagnosed "major depression, moderate," with a GAF score of 60. His physical problems contributed to his depression. [T. 378].

James B. LeVasseur, Ph.D. performed another PRT on Plaintiff October 22, 2004, indicating a need for RFC assessment for affective disorders. [T. 383-395]. The outcome was that "some" reduction in functioning, specified as moderate limitations in concentration and pace, was attributable to a mental disorder. [T. 395]. Dr. LeVasseur went on to perform a mental RFC on the same date, determining that Plaintiff could perform simple tasks in an environment with low social demand. [T. 381].

On November 17, 2004, a physical evaluation by Dr. Richard Yonker of Sarasota Arthritis Center was performed for DDS. [T. 397-402]. He

stated he took Aleve, without significant relief, for his hand pain. His gait was normal. He was unable to get his interferon injections because he had no insurance. A musculoskeletal exam showed tenderness and decreased range of lumber spine motion, as well as of the MCPs[5] bilaterally. He had multiple lesions on the dorsum of both hands and mild hyperpigmentation of the MCPs and PIPs.

On December 13, 2004, a physical RFC assessment was performed by Dr. Scott Andrews. He found Plaintiff to be able to perform light work with avoidance of concentrated environmental exposure and limited fingering.

On January 25, 2005, a psychiatric evaluation was performed by Dr. Madj Alsamman of the Mental Health Center of Englewood. [T. 415-6]. Plaintiff's long history of depression had recently been exacerbated by poor sleep, decreased appetite, hopelessness and helplessness, irritability and agitation, and crying spells, with occasional suicidal thoughts. His mood and affect appeared depressed and flat. His judgment and insight were

---

[5]Metacarpophalangeal (MCP): Relating to the metacarpus and the phalanges (fingers or toes); denoting the articulations between them.
http://www.medilexicon.com/medicaldictionary.php?t=54563 [last visited October 4, 2010].
Proximal interphalangeal joints (PIPs): 1. the synovial joints between the proximal and middle phalanges of the fingers and of the toes.
http://www.medilexicon.com/medicaldictionary.php?s=proximal+interphalangeal+joints [last visited October 4, 2010].

fair.  He was diagnosed with severe recurrent major depression, personality disorder with cluster B,[6] and a GAF of 50.  He was prescribed Remeron 15mg.

On March 8, 2005, Dr. Michael R. Stevens performed yet another PRT.  [T. 420-33]  He found moderate limitations in concentration stemming from depression, and stated claimant could, from a mental standpoint, perform simple tasks.  The mental RFC that Dr. Stevens completed on the same date [T. 434-7] found the same and added that Plaintiff could understand and remember instructions, be award of hazards, and be cooperative.

A physical RFC performed on April 22, 2005 by Dr. Jim Takach [T. 438-45] found that Plaintiff's capacity to do most light duty exertion was intact.  He was limited in fingering, feeling, and handling, and was found unable to climb ladders/scaffolds/ropes.  He was to avoid even moderate exposure to extreme heat and hazards.  He was to avoid concentrated exposure to extreme cold, humidity, noise, fumes and odors.

Plaintiff went on to visit the Mental Health Center of Englewood on

---

[6]Personality disorders are grouped into one of three clusters based on common characteristics. Cluster B represents the dramatic and erratic. Cluster B Personality Disorders, Suite101.com, http://www.suite101.com/content/cluster-b-personality-disorders-a30913 [last visited October 4, 2010].

four subsequent occasions through May 24, 2005. [T. 446-452]. The records are mostly illegible, but indicate that he was coming in for medication refills, but he refused therapy, against orders.

Liver function test scores were noted as "a little high" on August 17, 2007 at North George Medical Center. [T. 458].

At the hearing, Plaintiff testified that he first became unable to work due to his hand conditions. He experienced spontaneous blisters on his hands which break when bumped, and are extremely painful. Sunlight makes them feel like they are on fire. Air conditioning and cold packs helped, making the pain tolerable. [T. 40-1] The blisters did not extend above his wrists, and did not break upon normal contact with buttons, jars, pens, etc. [T. 43-4]. Plaintiff also experienced numbness in the fingertips. [T. 45].

He took interferon for his hepatitis years ago, but lost his insurance and could not obtain more. [T. 45]. He does not know of any symptoms from the hepatitis other than being tired. [T. 46]. His typical day was eating and sitting or lying in front of the television. Id. He has suffered depression occasionally for several years. It makes him want to "go away," and he does not interact with people other than his brother. [T. 48]. He determined that he could only sit for 30 minutes based on his television

17

viewing habits. [T. 49]. He was not sure how long he could stand. [T. 50-1]. He gave vague testimony about anxiety, comprehension, fear of crowds, and limitations on performing personal hygiene. [T. 51-2].

The following hypothetical residual functional capacity assessment (RFC) was stated as a basis for questions to the vocational expert (VE), William Harvey: occasional lifting/carrying of 20 pounds, frequent lifting/carrying of 10 pounds; ability to walk, stand or sit for 6 of 8 hours; frequent push/pull, handle, finger and feel; occasional climbing of ramps and stairs, balance, stoop, kneel, crouch and crawl; never climb ladders, ropes and scaffolds. The RFC also required avoiding concentrated exposure to extreme cold, wet, humidity, and fumes, odors, dust, gasses, and poor ventilation; and to avoid even moderate exposure to extreme heat and hazards. [T. 55]. Under that hypothesis, Plaintiff was unable to do his past work. Id. The addition of a prohibition to outdoor work and prolonged sun exposure, and a limitation to simple repetitive tasks in a low stress environment with occasional contact with coworkers, supervisors and the public, resulted in the VE's identification of small products assembler (DOT number 706.684-022), produce inspector (DOT number 529.687-186), and mail clerk or mail sorter (DOT number 209.687-026). The further addition of a need to avoid concentrated exposure to noise and vibration, and

limitation to occasional fingering eliminated two of those jobs: small product assembler and mail clerk or mail sorter.  No other light and unskilled jobs were available.  At the sedentary level, surveillance system monitor (DOT 379.367-010) was identified.  With the additional condition of GAF scores ranging from 40-50, it was opined that Plaintiff could not work. [T. 57].  In the alternative, with a GAF score of 60, a person might be able to work depending on additional unavailable facts, and the hypothetical limitation already built in, for occasional contact with people, somewhat takes into account the limitations suggested by a GAF of 60.  [T. 58].

## V.    THE ALJ'S DECISION

On October 15, 2007, the ALJ issued a decision denying the Plaintiff's claim.  [T. 16-25].  Proceeding to the sequential evaluation, the ALJ found that the Plaintiff's date last insured was December 31, 2009. [T. 18].  He then found that Plaintiff had not engaged in any substantial gainful activity since his amended alleged onset date of March 2, 2004.[7]  [T. 18].  The ALJ then found the following impairments to be severe impairments: porphyric cutanea tarda, hepatitis C, major depressive disorder, and personality disorder.  [T. 18].  The ALJ concluded, however, that the severe

_____

[7] The ALJ found substantial gainful activity between the original claimed onset date of May 24, 2002, and March 2, 2004, as a result of which Plaintiff amended his claim at the hearing to allege an onset date of March 2, 2004. [T. 16].

impairments did not meet or equal any of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  [T. 20].  The ALJ assessed the Plaintiff's residual functional capacity, finding that he could perform a wide range of light work.  Specifically, he can lift 10 pounds frequently and 20 pounds occasionally; sit, stand and walk six of eight hours; frequently push/pull, handle, feel and finger; occasionally climb, balance, stoop, kneel, crouch, and crawl.  He may never climb ladders, ropes or scaffolds.  He must avoid concentrated exposure to extreme cold, wet, humidity, gases, odors, dust, fumes, and poor ventilation; and avoid even moderate exposure to extreme heat and hazards.  He is unable to work outside and must avoid prolonged sun exposure.  He is limited to simple, repetitive tasks in a low stress environment with only occasional contact with coworkers and supervisors.  [T. 20].  He found that Plaintiff was unable to perform his past relevant work.  [T. 24].  Transferability was not material. Id.

The ALJ obtained the testimony of a vocational expert to determine that jobs did exist in significant numbers within the unskilled light occupational base.  [T. 24-5].  Accordingly, the ALJ concluded that the Plaintiff was not "disabled" as defined by the Social Security Act from July 14, 2004 through the date of the ALJ's decision.  [T. 25].

## VI.   DISCUSSION

Plaintiff assigns error to the ALJ's:

(1)   Finding that Plaintiff was not generally credible;

(2)   Reliance on VE testimony that was not consistent with the Dictionary
       of Occupational Titles (DOT) and was not represented as such.

### (1)   The ALJ's credibility analysis

Plaintiff claims that the ALJ's credibility analysis was erroneous in two ways.  The ALJ found Plaintiff to be "not generally credible." [T. 22].  One stated reason was that Plaintiff had discontinued treatment for his hepatitis C.  Plaintiff claims this was error because the treatment was terminated because Plaintiff could not afford it.  A second stated reason was that the ALJ relied on the reports of Dr. Harmon of October 11, 2002, and of Dr. Bohan of January 30, 2003, which suggested malingering.  Plaintiff asserts this to be error because these orders pre-dated the claimed period of disability.

The Court concludes that it was error for the ALJ to assess the absence of treatment against Plaintiff's credibility.  Plaintiff testified and the medical records reflect that hepatitis C treatment was discontinued because Plaintiff lost his insurance and was unable to afford the treatment. [T. 45].  A claimant may not be penalized for failing to seek treatment he

cannot afford; "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him."  Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003)(citing Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir.1988)).[8]

The ALJ's reliance on the questioned reports is also problematic.  For instance, the ALJ's conclusions from the Bohan report are inherently contradictory.  Dr. Bohan opined that Plaintiff "truly does not know" his own history, but the ALJ deduced therefrom that the report supported a conclusion of malingering. [T. 22].

These errors, however, had no effect on the ALJ's ultimate decision.  The assessment of the Plaintiff's credibility was for the purpose of evaluating his testimony as to his limitations.  In short, it is part of the RFC determination.  Despite finding Plaintiff to be "not generally credible," the ALJ made an RFC determination that was entirely consistent with the Plaintiff's testimony.  Specifically, the ALJ found that Plaintiff can lift ten pounds frequently and twenty pounds occasionally; sit, stand and walk six of eight hours; frequently push/pull, handle, feel and finger; occasionally climb, balance, stoop, kneel, crouch, and crawl.  He may never climb

---

[8] Since this case originated in Florida, the law as interpreted by the Eleventh Circuit applies.

ladders, ropes or scaffolds.  He must avoid concentrated exposure to extreme cold, wet, humidity, gases, odors, dust, fumes, and poor ventilation; and avoid even moderate exposure to extreme heat and hazards.  Most importantly the ALJ found that Plaintiff is unable to work outside and must avoid prolonged sun exposure.  He is limited to simple, repetitive tasks in a low stress environment with only occasional contact with coworkers and supervisors.  [T. 20].  Even though Plaintiff gave some vague testimony on some of these points, he did not contradict this RFC.

To require reversal, an error must be prejudicial, not merely harmless.  *See* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir.1983).  The weighing of Plaintiff's credibility was just one of several steps in the RFC assessment process.  SSR 96-8p.  That process has as its end goal the determination of Plaintiff's maximum ability to perform work functions after limitations from impairments and symptoms are taken into account.  Though the ALJ chose to find certain testimony was not credible, even if that testimony were believed, it is consistent with - and no evidence has been demonstrated that is inconsistent with - the ALJ's RFC.  Thus, there is no prejudice to Plaintiff from the ALJ's erroneous credibility findings.  For this reason this assignment of error is overruled.

**(2)    The ALJ reliance on VE testimony.**

Plaintiff argues that the ALJ erred in relying on the VE's testimony without first resolving conflicts between the Dictionary of Occupational Titles (DOT) and such testimony.

Social Security Ruling 00-4p, on which Plaintiff relies, governs how an ALJ may use vocational expert testimony:

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled.  The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.  SSR 00-4p at *4.

"[W]e rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy."  Id. at *2.

Generally, threshold compliance with the requirements of SSR 00-4p is sought via asking a rote question no more probing than 'does your testimony comply with the DOT.'  Case law on the evidentiary value of such an inquiry shows that minimal inquiry is not, by its absence, certain proof of non-compliance with SSR 00-4p.  See, e.g., Renfrew v. Astrue, 496 F.3d 918 (8th Cir. 2007).  To assert error, however, Plaintiff must show not only

an actual conflict between the VE testimony and the DOT, but also prejudice from such non-compliance.

When an actual conflict is shown between the DOT and the VE's testimony the ALJ has an affirmative duty to determine whether the VE's testimony is sufficiently well grounded to justify relying on it rather than upon the DOT, reliance upon which is permitted by regulation.  Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005).  Because of this affirmative duty and because Social Security cases are not traditionally adversarial, claimants are not to be routinely held to a requirement to ferret out, identify, and object to conflicts during the hearing.  See, e.g., Prochaska v. Barnhart, 454 F.3d 731, 735 (7th Cir. 2006).  It needs to be kept in mind, however, that the entire point of the application of the DOT and the VE's testimony is to determine that jobs exist in significant numbers in the national economy that Plaintiff can perform.  20 C.F.R. 404.1560(c).

Plaintiff points to three areas of conflict between the DOT and the VE's testimony: handling, reasoning and social functioning.

As to the functional limitations in handling, Plaintiff points to an inconsistency between the RFC and the DOT's requirements for the mail clerk job identified by the VE.  The ALJ found, however, that the elimination of that job still leaves a significant number of available jobs as indicated by

the VE.  Plaintiff does not claim that the removal of this job classification results in there no longer being a significant number of jobs available.  As such, failure to cure that conflict was of no consequence to the determination at Step 5.

Plaintiff next argues that the "reasoning levels" necessary for certain jobs the VE found to be available for a person with Plaintiff's limitations are at variance with Plaintiff's RFC.  Plaintiff particularly points to the job of small products assembler, which requires a Reasoning Level of 2, arguing this is inconsistent with Plaintiff's limitation to "simple repetitive tasks." [T. 20].  Reasoning Level 2 calls for an employee with the ability to "apply common sense understanding to carry out detailed but uninvolved written or oral instructions." [T. at 476].  Plaintiff however, presented no evidence and makes no explanation of how "carry[ing] out detailed *but uninvolved* written or oral instructions" is inconsistent with or different from "simple repetitive tasks."

Similarly, the Plaintiff offers no argument or authority to support his assertion that a conflict exists between the DOT definition of the surveillance system monitor job and the RFC's limitation to "a low stress environment with only occasional contact with coworkers and supervisors." [T. 20, Doc. 13-19].  Specifically, his argument assumes, without

explanation, that there is more than "low stress" in the surveillance job's duties of reviewing television monitors for crime and reporting it, and assumes that the same circumstances call for greater than "occasional" contact with coworkers, supervisors and the public.   There is, however, no semantic basis for this argument, and there is nothing in the record to support it.  "Occasional" as a measure of the frequency of task performance means anywhere from none to one-third of an eight hour day. SSR 83-14 at *4.  The gist of Plaintiff's argument appears to be that the actual contact demands of the job so exceed the "occasional" contact limitations stated in the RFC as to display the sort of "obvious" conflict that triggered the ALJ's duty to have noticed and resolved it at the hearing. There is nothing in the record, however, to substantiate this.

The ALJ's determination that jobs exist in sufficient numbers in the national economy that Plaintiff can perform is supported by substantial evidence.  There was no further need to resolve any apparent differences between the DOT and the VE's testimony.  For these reasons this assignment of error is overruled.

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ variously applied the correct legal standards and made only harmless error, and that

there is substantial evidence to support the ALJ's finding of no disability from the date of onset to the date of his decision.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 14] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 13] is **DENIED.**

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: October 6, 2010

Martin Reidinger
United States District Judge